[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 24, 2006
THOMAS K. KAHN
CLERK

_____

No. 06-11269
Non-Argument Calendar
_____

D. C. Docket No. 04-00435-CV-CAR-5

ROBERT OSBORN,

Plaintiff-Appellant,

versus

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(August 24, 2006)

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Robert Osborn appeals the district court's order affirming the Commissioner's denial of supplemental security income benefits, 42 U.S.C. § 1383(c)(1). On appeal Osborn argues that the ALJ (1) failed to evaluate his back condition prior to fusion surgery; (2) failed to evaluate his headaches before he received specialized treatment; (3) ignored the Commissioner's consultative psychologist's report; (4) improperly evaluated his credibility; (5) failed to enter a finding regarding his wife's credibility; (6) improperly rejected the opinion of his treating physician, Dr. Abdulla; and (7) erred by failing to obtain needed medical records or recontacting Dr. Abdulla. For the reasons set forth more fully below, we affirm.

On October 10, 2002, Osborn filed an application seeking supplemental security income benefits, claiming a disability that began September 1, 2001. In his application, Osborn claimed that he was disabled due to three ruptured lumbar discs, severe abdominal cramping, severe migraines, severe chronic fatigue syndrome, and a possible spinal column viral infection. His application was denied initially and on reconsideration.

Osborn then requested and received a hearing before an ALJ, claiming low back problems, GI problems, enlarged prostate, severe migraines, sleep apnea and daytime drowsiness, hypertension, pain, and psychological problems such as

2

attention deficit disorder and severe depression. Osborn was 45 years' old at the time of his hearing and had graduated high school and attended some college. Osborn's first job out of college was working on construction projects for the Georgia Steel Company, and he later became an electrician before moving on to telecommunications work in 1993. As part of his telecommunications work, Osborn maintained telephone systems and communications systems in schools. In 1995, Osborn again began doing construction and electrical work before joining Cox Communications as their "I.T. person in their facilities." While there, he was responsible for backing up data and maintaining sales terminals. Osborn then moved to Brown and Williamson as a "Data Center Operator," in which he monitored 30 or so computer systems from his chair in a closed facility. After a year and a half, Osborn transferred to the tech support department, where he maintained computer desktop equipment and was required to drive to any of eight different facilities. He remained there until he began seeing doctors for his medical issues.

As to his medical problems, Osborn testified that his sleep apnea was a minor problem and that his double vision was something that he had been living with since an early age. Urinary frequency and an enlarged prostate continued to be a problem, and Osborn testified that he still suffered from abdominal pain,

although the pain might be related to his back condition. The symptoms of both began in 2001, but he left his job because his contract expired, not because of the symptoms. As to medications, Osborn took Neuronton to manage his migraine headaches, but had discontinued a painkiller prescribed for his back pain. Osborn also discontinued medication for his blood pressure, but occasionally took Pamalor for depression. In addition, Osborn testified that he took medication for his stomach, as well as other medications to prevent him from falling asleep in the middle of the day and for attention deficit disorder.

Next, Osborn described a typical day as consisting of waking up, cooking breakfast, helping the kids "get out the door," checking e-mail, attending to appointments, and taking care of the household. Occasionally, Osborn drove his kids to school as well. Osborn testified that he had been looking for work, and, since 2001, had taken a few temporary contract jobs to work on friends' equipment. In 2002, Osborn worked on "a couple" of temporary contracts, and in 2003, again worked on a temporary contract basis performing data entry for a few companies. As to his back problem, Osborn testified that he had a "fusion" done and the back pain he previously suffered had somewhat subsided. He further stated that some functions had returned, some had not, and some came and went.

Upon further examination, Osborn testified that his back surgery took place

4

on June 16, 2003, and he had received a "two level fusion" with hardware and a bone-graft of his right hip. He had continuous problems with his hip, which he described as painful and achy. Since the graft, the pain was still there, but "not quite as intense." As to his lower back, Osborn testified that it was still "fairly painful" and it sometimes felt like it was swelling if he became tired or over-stressed. Osborn stated that repeated sitting, standing, and walking increased the degree of pain he felt in his back, and that to relieve the pain he laid down flat on the floor or across a firm bed. He testified that the pain was slightly less than a daily occurrence.

As to his migraine headaches, Osborn indicated that they could get so bad that he would have to sit down in a dark, quiet area, and that, at times, they would continue to the point of nausea or passing out. These migraines occurred anywhere from two to eight times a week depending on his level of stress. When they occurred, the migraines would last anywhere from a couple of hours to a couple of days, sometimes to the point of requiring an injection to cure them. In addition, Osborn testified that he suffered from irritable bowel syndrome that continued to be a problem post-surgery.

Next, Osborn testified that he felt depressed and described a number of factors, including the issues with his back, mobility problems, not being able to

interact with his children, and marital issues. On a scale of 1 to 10, Osborn stated that his back pain at best was a four or five, but usually around a six or seven. On the same scale, Osborn stated that the pain associated with his migraines was at best three or four, and at worst, off the scale. Despite the pain, however, Osborn testified that he was able to take care of himself, such as bathing, dressing, and eating. The only thing he had trouble with was tying his shoes. He also testified that it was painful to stand and urinate and that he sits down the majority of times.

Osborn further testified that changing positions from sitting to standing was never easy and put stress on his back, and sitting for extended periods of 15-30 minutes caused his back to stiffen quite a bit. Standing for extended periods of 5-10 minutes also caused him to feel stiffness. As to walking, he testified that it was a problem depending on how much he did, and that things like shopping and cutting grass were out of the question, although he did "walk around the mall." Osborn further stated that he had a 30-pound weight lift limit, and that things like bending, stooping, and squatting were activities that he avoided.

At the administrative hearing, a vocational expert (VE) classified Osborn's past jobs according to the Dictionary of Occupational Titles. All of Osborn's past jobs were considered "skilled," but the exertional level changed depending on the work. Some jobs, such as electrician, were considered "medium" exertional level,

while others, such as maintenance mechanic, were considered "light." Other jobs, such as working as a customer service representative, were listed as "sedentary." Having heard the entire record, and having the benefit of a vocational expert's (VE) opinion that the jobs performed by Osborn in 2002 and 2003 were skilled and either light or sedentary, the ALJ found that working those jobs was inconsistent with Osborn's disability claims. The ALJ then posed a hypothetical question to the VE. The VE was asked to assume an individual of Osborn's age, education, and work experience with the following limitations: (1) frequently able to lift 10 or more pounds and occasionally 20 pounds; (2) able to stand or sit for six to eight hours in a work day; (3) unlimited pushing and pulling; (4) inability to climb ladders, ropes, or scaffolds, and inability to frequently climb ramps and stairs; (5) frequently able to balance and stoop and occasionally able to kneel, crouch, and crawl; and (6) must avoid constant exposure to hazards such as moving machinery and unprotected heights. Based on these characteristics, the VE opined that such an individual could perform some of his past relevant work as it is generally performed in the national economy. Specifically, the VE testified that Osborn could work in a customer representative position, a data communications analyst, a data communication technicians supervisor, a desktop publisher, or a computer system hardware analyst. Jobs that Osborn could not perform would be

7

maintenance mechanic for telephones or electrician.

Prior to the close of the hearing, Osborn requested 30 days in which to file medical records of Dr. Abdulla, who treated him. The request was granted and the record reflects that the hearing was reopened for the purpose of accepting those medical records into evidence.

The ALJ ultimately concluded that Osborn was not disabled within the meaning of the Social Security Act. The ALJ determined that Osborn's sleep apnea, double vision in one eye, and depression were "non-severe" disorders, but that the degenerative disc disease was an impairment that was severe within the meaning of the regulations, although not so severe as to meet or medically equal an impairment considered a presumed disability. The ALJ noted that Osborn's eye examinations revealed no aneurysm or vision loss and that his abdominal pain was not related to hernia, organ damage, or lymph node enlargement. The ALJ found that Osborn's urinary frequency problems were not unusual for males his age, and that Osborn had 5/5 strength during several of his treatments. As to the headaches, the ALJ noted that Dr. DeRossett, who treated Osborn, had indicated that they should not be considered disabling, notwithstanding Dr. Abdulla's statement "for use in Mr. Osborn's disability claim" to the contrary.

The ALJ then stated that he had considered all of Osborn's symptoms,

8

including pain, to the extent it was consistent with the objective medical evidence. He considered all of the medical opinions in the record, and found that Osborn's allegations were "far out of proportion to the degree of impairment established by the objective medical record." The ALJ found that Osborn's complaints, by themselves, did not support any restrictions other than those apparent as a result of his spinal disorder. The ALJ noted that Dr. Abdulla had provided two letters deeming Osborn 100% medically disabled, but found that Abdulla's conclusions were entitled to only minimal weight and were not controlling. In particular, the ALJ found that the first letter did not even reflect a diagnosis, and, therefore, there was nothing to support a conclusion that Osborn was disabled. As to the second letter, the ALJ found that other medical records, specifically those of Dr. Kennebrew, contradicted Abdulla's conclusions. The ALJ further found that Abdulla's findings of chronic fatigue and chronic pain were interwoven with the lower back and leg pain, as well as the migraine headaches, and because there was no objective medical evidence to support Abdulla's findings, the ALJ found no reasonable basis for Abdulla's conclusion that Osborn was fully disabled.

Thus, the ALJ found that Osborn retained the residual functional capacity for light work, lifting 10 pounds frequently, 20 pounds occasionally, with standing, walking, and sitting for 6 hours in an 8-hour day with unlimited pushing and

pulling. He found that Osborn could not climb ladders, ropes, or scaffolds, but could frequently climb stair and ramps, as well as balance, stoop, and occasionally kneel, crouch, or crawl. The ALJ further found that Osborn must avoid constant exposure to such hazards as machinery and unprotected heights. Based upon this residual functional capacity, the ALJ, based on the VE's expert opinion, found that Osborn could perform his past relevant work as a customer service representative, data communications analyst, and data communication technician supervisor as he previously worked in those jobs and how those jobs were generally performed in the national economy.

Accordingly, the ALJ found that Osborn (1) met the non-disability requirements for a period of disability and disability benefits; (2) had not engaged in substantial gainful activity since the alleged onset of his disability, notwithstanding that he admitted self-employment and reported earnings to the IRS; (3) had a severe impairment in the form of degenerative disc disease, but did not meet one of the listed disabilities within the meaning of the regulations; (4) was not totally credible regarding his limitations and allegations; (5) had residual functional capacity for a substantial range of light work; (6) could perform past relevant work; and (7) was not disabled as defined under the SSA. The ALJ's decision became the Commissioner's decision after Osborn's appeal was denied.

The district court affirmed.[1]

## I.

We review a social security case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied. Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is defined as more than a scintilla, i.e., evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citation omitted). Even if we find that the evidence preponderates against the Commissioner's decision, we must affirm if the decision is supported by substantial evidence. Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1995).

A claimant applying for supplemental security income must prove that he is disabled. 20 C.F.R. § 404.1512; Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520; Jones, 190 F.3d at 1228. First, the claimant must show that he has not engaged in a

---

[1] We note that there were numerous medical records and evaluations submitted in support of Osborn's claims. The parties at this point are familiar with those records and reports, and we have thoroughly reviewed them. Rather than summarize their full contents, we will address each of Osborn's arguments in turn, referencing the relevant documents as needed.

11

substantial gainful activity.  Jones, 190 F.3d at 1228.  Second, he must prove he has a severe impairment or combination of impairments.  Id.  In step three, if his impairment meets or equals a listed impairment, he is automatically found disabled.  Id.  If it does not, as in the present case, he must prove that he is unable to perform his past relevant work.  Id.  Finally, if the claimant cannot perform past relevant work, then the burden shifts to the Commissioner in the fifth step to show that there is other work available in significant numbers in the national economy that the claimant is able to perform.  Id.

At the outset, we note that Osborn's brief alludes to errors committed by the magistrate in his report and recommendation, as well as to the district court's order affirming the ALJ's decision.  Because we only review the decision of the ALJ, only Osborn's arguments regarding that decision are addressed.  See Shinn ex rel. Shinn v. Comm'r Soc. Sec., 391 F.3d 1276, 1282 (11th Cir. 2004).  We now turn to each of Osborn's enumerations of error.

### A.  Osborn's Back Condition

On appeal, Osborn first argues that the ALJ failed to evaluate his back condition before fusion surgery took place, and, therefore, failed to properly evaluate whether Osborn was disabled for the 21 months prior to the surgery that improved his condition.  Thus, Osborn argues that he was entitled to disability

12

benefits from September 2001 until the surgery because the objective medical records prior to the surgery demonstrate the severity of his degenerative disc disease.

We conclude that the ALJ did not err by failing to properly consider his back condition prior to fusion surgery. As we have held, the burden is on the claimant to prove that he is disabled, and here, substantial evidence supports the ALJ's finding that Osborn was not disabled because he could perform past relevant work at all times prior to the date of decision. See Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) ("The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."). While Osborn alleged the onset of disability in 2001, his testimony was that he left his job because his contract expired, not that he was disabled. Moreover, Osborn's brief relies on medical records from January 2002 and February and April 2003 to prove that the ALJ ignored the medical records. In January 2002, Dr. Kinnebrew diagnosed Osborn with degenerative disc disease, but five days later, when Osborn appeared for treatment in the form of steroid injections, his strength was noted to be five out five. At a second steroid injection, Osborn was found to be more mobile. In short, nothing in Kinnebrew's diagnosis provides any objective evidence of Osborn's limitations as a result of his back impairment, and, therefore,

13

the report does not contradict the ALJ's findings in any way.

Second, Osborn points to a February 2003 electromyography report indicating that Osborn suffered from long-standing multi-level nerve root irritation. However, a review of that report indicates only that Osborn suffered from an impairment—it provided no objective medical evidence proving that Osborn was incapable of performing past relevant work in spite of his impairment.

Lastly, the crux of Osborn's argument is that the ALJ erred because Abdulla's opinion that Osborn was disabled was supported by numerous medical records that the ALJ ignored. Abdulla's opinion, appearing twice in the record, was that although Osborn's medical problems, viewed separately, were not disabling, the sum of all of his medical problems rendered him physically and socially dysfunctional, and, therefore, he was disabled. Abdulla's letters, while they offer a conclusory opinion, do not indicate what, if any, limitations Osborn had as a result of his medical problems. Abdulla's letters do not offer any evidence or insight into what Osborn was prevented from doing. While the record makes clear that Osborn suffered from degenerative disc disease, requiring surgery, there is no objective medical evidence of his limitations during that same time period. The only evidence in support of Osborn's claims, other than Osborn's (and his wife's) own statements (discussed infra), was Abdulla's letter.

14

In contrast, a state employee interviewed Osborn and observed no difficulties. In December 2002, Osborn's strength was gauged at five out of five. On February 5, 2003, a Functional Capacity Assessment, completed prior to Osborn's surgery, found that Osborn could lift or carry 20 or more pounds, frequently lift or carry 10 pounds, stand or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and was unlimited in his ability to push and pull. One day later, a Range of Motion test concluded that Osborn was capable of reaching, pushing, pulling grasping, and fingering, and Osborn was found to have only a 7 percent impairment of his cervical range of motion and a 14 percent impairment of his lumbar range of motion. Moreover, Osborn himself admitted that, during the time between the alleged onset of disability and surgery, he performed a couple of contract jobs for friends and companies performing date entry or working on equipment—work he previously had done.

While it is true that Abdulla's opinion as a treating physician is ordinarily entitled to considerable weight, see Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997), here Abdulla's opinion is unsupported by any evidence demonstrating the severity of Osborn's limitations or capacity for work. In short, Abdulla's opinion that Osborn was 100% medically disabled was a conclusory opinion and unsupported by objective medical evidence, and, therefore, the ALJ was permitted

15

to discount it.  Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).  Thus, while there is no dispute that Osborn's back problems constituted an impairment, substantial evidence preponderates in favor of the ALJ's determination that Osborn could perform past relevant work, and, therefore, was not disabled within the meaning of the SSA before his surgery because Osborn failed to offer objective evidence of his inability to work.  See McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986) ("the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality"); see also Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1986) (persuasively noting that a diagnosis of a condition says nothing about the condition's severity).

### B.  Osborn's Headaches

Next, Osborn argues that he suffered from migraine and other types of headaches until successful treatment by Dr. DeRossett, and that the ALJ ignored his history of headaches and the psychological report concluding that he was not overstating his symptoms or exaggerating his pain.

First, Osborn is not claiming that his headaches were disabling after May 2003, following treatment by Dr. DeRossett, but that the ALJ erred by failing to consider or mention Osborn's more severe prior history of headaches.  However,

16

the medical records reveal that Osborn complained of migraine headaches as far back as August 1998, more than three years before he filed for disability. He continued to present symptoms of migraine headaches through 2001, but during this same time continued his employment until his contract expired. In December 2002, Osborn was treated by Dr. Qadir, who diagnosed Osborn with mixed chronic headaches, although no description of either the severity or duration of those headaches was noted. After being referred to Dr. DeRossett, Osborn received treatment that significantly improved his headaches, resulting in DeRossett's letter indicating that, while Osborn might suffer some decrease in physical and mental activities during a headache, his headaches should not be considered disabling. No other medical records relating to headaches appeared in the record.

The only other evidence presented was Osborn's subjective testimony, which indicated that his migraines could occur anywhere from two to eight times a week and could get bad enough that he would have to sit in a dark, quiet area. He testified that these migraines would last anywhere from a couple of hours to a couple of days, and sometimes they required an injection. None of the medical records, however, indicate that Osborn received injections for his migraines, nor did they reflect the level of severity to which Osborn testified. However, in spite of the pain from his migraines, Osborn was able to take care of himself and

17

managed to work from at least 1998 (the first medical complaint of migraines) until September 2001.  He also managed to work for friends and other employers on temporary contract jobs in 2001, 2002, and 2003.  Moreover, Osborn, on a typical day, was capable of waking up, cooking breakfast, helping the kids "get out the door" and driving them to school, checking e-mail, attending to appointments, and taking care of the household.

Finally, Osborn briefly alludes to the psychological evaluation completed by Michele Martin, Ph.D, on June 11, 2003, and argues that the ALJ ignored Martin's conclusion that Osborn was not overstating his symptoms or exaggerating his pain. However, Martin's report notes that Osborn has had severe headaches his entire life, severe migraines for the past 10 years, and daily migraines at the time of his evaluation.  While Osborn may have been sincere, it does not appear that he described his symptoms to Martin.  Furthermore, Osborn's own statements are contradicted by medical records from April 24, 2003, and June 4, 2003, where Osborn reportedly had a "50% improvement in his headaches and only 4-5 'bad headaches'" and had indicated that his migraines were "much better," respectively.

In any event, Osborn also told Martin that he had suffered from migraines for the last ten years and severe headaches his entire life.  Taking Osborn's statement as true, he suffered from migraine headaches since 1993, but was

18

gainfully employed from 1993 until 2001 as, among other things, an electrician, construction worker, and information technologies worker. In short, the ALJ's finding that Osborn's migraines were not disabling was supported by substantial evidence.

## C. The Psychologist's Report

Osborn next argues that the ALJ failed to mention the psychological report done by Michele Martin, who diagnosed Osborn with depression and found that his work-related mental abilities were only "fair" in some respects. He argues that the ALJ violated his duties by failing to mention and explain why the report was rejected and further argues that, because the combination of Osborn's impairments is what was disabling, the ALJ's failure to correctly gauge one of those impairments was in error. Lastly, Osborn argues that the ALJ incorrectly concluded that his depression was "non-severe."

The regulations state that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities" include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions;

19

(4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. Id. § 404.1521(b)(1)-(6). We have explained that an "impairment is not severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).

Osborn's argument here is meritless. The ALJ specifically mentioned that, according to "the consultative examination report and state agency assessment[,]" depression had not significantly restricted Osborn's ability to work. This finding was consistent with Martin's evaluation, in which she concluded that, while Osborn suffered from depression, his ability to remember and follow simple or complex job instructions was fair, his ability to maintain attention and concentration was fair, his ability to interact with co-workers, supervisors, and the public was fair, and his ability to adhere to a schedule and meet work schedule and production norms was fair. She further concluded that Osborn's judgment was good. Thus, Martin's report, while evidence that Osborn suffered from depression, was also substantial evidence that the depression did not impair Osborn because it did not impair his ability to perform basic work activities. To the extent that

Osborn is arguing that the ALJ erred by failing to include the effect of Osborn's "combination of impairments," it was not error for the ALJ to disregard Osborn's depression because it was not severe within the meaning of the regulations.

## D.  Osborn's Credibility

Osborn further argues that the ALJ erred by finding his claims incredible, first arguing that the ALJ ignored the report of the psychological consultant, who found that Osborn was not overstating his symptoms or exaggerating his pain.  He also argues that the ALJ ignored the MRI of his cervical spine showing "severe abnormalities," eventually requiring corrective surgery, as well as an MRI of his brain showing vascular defects and an MRI and EMG of his lumbar spine showing impairments reasonably capable of causing the neck, back, and head pain of which he complained.  Osborn also argues that the ALJ failed to mention that his doctors determined that surgery was necessary because all other treatments had failed, and, therefore, failed to recognize that Osborn's complaints were consistent with his wife's report and the improperly rejected opinion of Abdulla.

Where a claimant attempts to establish a disability through his own testimony, this Court uses a three-part "pain standard" to evaluate the claimant's subjective symptoms.  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). "The pain standard requires (1) evidence of an underlying medical condition and

21

either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." Id. If the ALJ chooses not to credit the claimant's testimony, he must discredit it explicitly and articulate explicit and adequate reasons for doing so. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991).

The regulations further direct that statements of pain or other symptoms will not alone establish that a claimant is disabled, but rather there must be medical signs and laboratory findings showing a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged, and, when considered with other evidence, would lead to a conclusion that the claimant is disabled. 20 C.F.R. § 404.1529(a). In reaching a conclusion regarding a claimant's disability, the ALJ considers "all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons." Id. § 404.1529(c)(3). Inconsistencies or conflicts between a claimant's statements and the other evidence are also considered. Id. § 404.1529(c)(4).

Here, the ALJ explicitly found that Osborn's "allegations [were] far out of

22

proportion to the degree of impairment established by the objective medical record. His persistent complaints do not, by themselves, support any restrictions other than those apparent as a result of his spine disorder." Specifically, the ALJ found that Osborn had been prescribed medication for various reasons, but his most substantial treatment was spinal surgery that improved his condition. The ALJ noted that Osborn's weight had remained stable without substantial interference from any alleged gastro-intestinal problems, and further noted that his blood pressure was controlled without evidence of "end-organ damage." Finally, the ALJ found that Osborn's depression, headaches, fatigue and other symptoms had been considered, but found minimal by his own doctors and the state agency consultants. Thus, the ALJ concluded that Osborn was "not fully credible in his allegations," and gave weight to his statements only as corroborated in the medical record and not inconsistent with Osborn's admitted activities, such as housework and computer consulting.

As noted above in sub-issues b. and c., supra, substantial evidence supported the ALJ's determination that neither Osborn's depression nor his headaches were severe and disabling impairments within the meaning of the Act. The ALJ correctly noted that Osborn had been prescribed numerous medications for a variety of problems, but more importantly, properly considered Osborn's daily

23

activities and the objective medical record when discrediting his testimony. See 20 C.F.R. § 404.1529(c)(3) and (c)(4). As previously discussed, the medical evidence in this case presents diagnoses, but no descriptions of limitations on Osborn's functional capacity or ability to work other than the state agency assessments. The biggest limitation, as correctly identified by the ALJ, was Osborn's degenerative back disease, but even as to that impairment, properly characterized as severe, Osborn's subjective descriptions of symptoms and pain were not corroborated by any medical evidence, and, more importantly, were contradicted by his daily activities, which included household chores such as cooking, working at a computer, and driving the children to school in the morning. Osborn even performed some contract jobs working on computer equipment and performing data entry. As the ALJ noted at the hearing, while such work might not be substantial gainful activity, it clearly was inconsistent with Osborn's disability claims. Thus, the ALJ explicitly articulated his reasons for discrediting Osborn's testimony, and substantial evidence supported the ALJ's finding that Osborn's subjective complaints were overstated in light of the absence of medical records corroborating his claims.

Osborn argues in his brief that the ALJ failed to ask and answer the question of whether Osborn had objectively determined impairments that reasonably could

be expected to produce the symptoms he described. The record, while it clearly shows that Osborn had degenerative disc disease, contains no objective evidence of Osborn's limitations other than the state agency examinations that concluded that Osborn could function at a light level of work and suffered only a 7 percent impairment of his cervical range of motion and 14 percent impairment of his lumbar range of motion. As noted above, Dr. Abulla's conclusory opinion was properly afforded little weight by the ALJ, see Edwards, 937 F.2d at 583, and, therefore, substantial evidence supported the ALJ's credibility determination in light of the absence of objective medical evidence supporting Osborn's claims.

### E. Osborn's Wife's Statements

Osborn also argues that the ALJ violated his duties when he failed to even mention Osborn's wife's written statements and observations about his ability to perform daily activities. Osborn argues that the social security regulations favor consideration of lay observations, even of family members, and he argues that these regulations overrule cases that have held that an ALJ implicitly evaluates the credibility of lay witnesses by explicitly evaluating the credibility of the claimant.

We have held that an ALJ must "state specifically the weight accorded each item of evidence and the reasons for his decision." Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986). The testimony of family members is evidence of a

25

claimant's subjective feelings of pain. See Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). Even if the ALJ fails to make an explicit credibility determination as to a family member's testimony or statements, however, we will not find error if the credibility determination was implicit in the rejection of the claimant's testimony. Id. at 1254-55, citing Allen v. Schweiker, 642 F.2d 799 (5th Cir. 1981).

In Allen, the petitioner challenged the ALJ's denial of disability insurance benefits on the ground that the ALJ failed to make an adequate finding of fact regarding the credibility of his former wife's testimony. Allen, 642 F.2d at 801. Both the petitioner and his wife testified as to his disability at the hearing. The judge specifically found that Allen's testimony, the primary evidence in support of his alleged disability, was not credible. Id. No such finding, however, was made as to the testimony of Allen's former spouse. Nevertheless, the court found that the ALJ's credibility determination as to the spouse was clearly implied by the explicit ruling as to Allen's testimony. Id.

In the instant case, Osborn's wife submitted, as part of Osborn's "Disability Report," a third party statement indicating that Osborn's condition, described as frequent urination and bowel movements, abdominal pain and cramping, a swollen prostate, and an inability to walk any distance without severe pain, prevented him

26

from working.  She stated that Osborn stayed at home most of the time, but was able to use a computer for a couple of hours each day and did most of the cooking, as well as laundry and loading and unloading the dishwasher.

Like in Allen, "[w]hile the findings in this case could be improved upon," the ALJ clearly rejected Osborn's subjective testimony regarding the disabling nature of his condition, and, therefore, while the ALJ could have mentioned Mrs. Osborn's statements, we conclude that the ALJ's specific and explicit credibility determination as to Osborn's testimony sufficiently implies a rejection of Mrs. Osborn's testimony as well.  Allen, 642 F.2d at 801.

### F.  Dr. Abdulla's Opinion Letters

Next, Osborn argues that the ALJ improperly rejected Abdulla's two, separate opinions concluding that he was 100% medically disabled.  As to the first opinion, Osborn argues that the district court improperly dismissed it because it failed to offer a diagnosis for any of Osborn's ailments and the district court could have contacted Abdulla for additional information.  Moreover, he argues that Abdulla's second letter explained the diagnoses and was consistent with the original letter.  Second, Osborn argues that Abdulla's opinions were not inconsistent or in conflict with the opinions of Drs. DeRossett and Kennebrew because Abdulla's opinion came before Osborn underwent surgery for his back and

27

treatment for his headaches. Osborn further argues that no doctor who examined Osborn opined that, pre-fusion surgery, he was able to work.

"The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Lewis, 125 F.3d at 1440. "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." Id. We have found "good cause" to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. Id. We have also held that a treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. Edwards, 937 F.2d at 983.

Here, Dr. Abdulla submitted two letters, the first in November 2002, one month after Osborn filed his disability claim, stating that, although Osborn did not have a single disabling condition, the constellation of his medical problems rendered him 100% "medically disabled." Abdulla did not identify any conditions, nor did he state what, if any, functions Osborn could perform or what his specific limitations were. The second letter was written in May 2003, and Abdulla at that time wrote that Osborn suffered from lumbosacral radiculitis, severe intractable migraines, HTN, chronic (idiopathic) abdominal pain, chronic pain syndrome, and

28

chronic fatigue syndrome. Without so much as indicating the symptoms, effects, limitations, or otherwise describing what functions Osborn could perform, Abdulla again concluded that Osborn was, in his opinion, completely disabled.

The ALJ specifically found that Abdulla's opinions were entitled to no more than minimal weight and not controlling. As to the November 2002 letter, the ALJ found that, because Abdulla did not even have a diagnosis of Osborn's ailments, he could not have made a medical or legal finding of disability. As to the May 2003 letter, the ALJ found that Dr. Kinnebrew's records indicate that Osborn was doing well post-surgery. Regarding the headaches, the ALJ found that Dr. DeRossett had treated the headaches and did not believe them to be disabling. The ALJ found no evidence in the record supporting Abdulla's opinion, and, therefore, found Kinnebrew, DeRossett, and the state agency determinations more persuasive.

We conclude that substantial evidence supports the ALJ's findings. As noted above, Abdulla's opinion in this case was nothing more than a conclusory statement unaccompanied by objective medical evidence, and, therefore, not entitled to the weight ordinarily given to a treating physician. Edwards, 937 F.2d at 583. Indeed, while the medical records in this case make clear that Osborn suffered from degenerative disc disease, and while Abdulla's second letter certainly reflects several diagnoses, it does not indicate in any way the limitations

29

these diagnoses placed on Osborn's ability to work, a requisite to a finding of disability. McCruter, 791 F.2d at 1547 ("the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality"); see also Higgs, 880 F.2d at 863 (persuasively noting that a diagnosis of a condition says nothing about the condition's severity).

While we think the ALJ could have spent more time discussing pre-fusion surgery medical accounts, Osborn had the burden of proof with respect to proving disability, and although he argues in his brief that "no doctor who examined [him] agreed with the ALJ and opined he was able to work before fusion surgery," his argument actually undermines his appeal. In reality, no doctor who examined Osborn opined that he was not able to work before surgery. However, the state agency assessment, done pre-surgery, found that Osborn could perform a light level of work. Another state evaluation observed no difficulties. The closest thing to a limitation was a pre-surgery evaluation by Dr. Stefanis, who observed that Osborn had a "slow gait," favoring his left leg over his right. In and of itself, that observation does not provide any evidence of a work-related limitation. A couple of months later, however, Michelle Martin observed Osborn walking with normal gait.

30

In sum, Osborn had the burden of proving he was disabled, but the only medical evidence supporting his claim, other than his subjective complaints, was the conclusory opinion of Dr. Abdulla. Osborn's medical records reveal only diagnoses, not reasoned and medically-supported opinions detailing Osborn's work limitations or limited functions, and, therefore, substantial evidence supported the ALJ's decision to give minimal weight to Abdulla's opinion and more weight to the state agency's evaluation. Osborn had the burden of proof, and although he could have sought a statement from one of his other treating physicians regarding his limitations and functional deficiencies, he did not. Therefore, substantial evidence supported the ALJ's findings.

## G. Sufficiency of the Record

Lastly, Osborn argues that the ALJ erred by failing to recontact Abdulla to clarify his opinion of Osborn's condition pre-surgery. Furthermore, Osborn argues that the ALJ failed to obtain medical records from a Dr. Cohen, who, according to Osborn's wife's statement, treated Osborn at Emory University. He argues that the ALJ should have obtained these records, as well as the records from Osborn's gastroenterologist, Dr. Shahirar Sedgi, before discounting his claims of abdominal cramping.

"Because a hearing before an ALJ is not an adversary proceeding, the ALJ

31

has a basic obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). The regulations provide that the ALJ may order a consultative examination when warranted. 20 C.F.R. § 404.1517. Moreover, "[w]hen the evidence . . . from your treating physician or psychologist or other medical source is inadequate . . . to determine whether you are disabled," the Commissioner is empowered to recontact the treating physician to obtain additional information. 20 C.F.R. § 404.1512(e). In addition, the regulations provide that the Commissioner will develop a claimant's medical history for at least 12 months preceding the month in which a disability application is filed. See Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003), citing 20 C.F.R. § 416.912(d). "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." Ellison, 355 F.3d at 1276, citing 20 C.F.R. § 416.912(a).

First, the ALJ did not err by failing to recontact Dr. Abdulla for clarification of his report. As discussed above, substantial evidence supported the ALJ's determination that Osborn was not disabled, and that decision was supported by other treating physicians, such as Dr. Kinnebrew, as well as the state agency determinations. Therefore, there was no need for additional information or clarification. In any event, Osborn had the burden of producing evidence in

support of his claim and was represented by counsel, who neither requested a clarification nor objected that the medical records were inadequate.[2]

Second, Osborn's argument that the ALJ erred by failing to obtain records from a Dr. Cohen at Emory University or Dr. Sedgi, Osborn's gastroenterologist, are meritless. The record reflects that the Commissioner requested "all" medical records from Emory University, and Dr. Cohen's records were not included. At the hearing, the ALJ specifically asked Osborn if he wished to add anything to the record, and Osborn declined despite the fact that he had the burden of proving that he was disabled. In fact, at the close of the hearing, Osborn requested 30 days to supplement the medical record with Dr. Abdulla's medical records, which the ALJ granted. At no point during the proceedings did Osborn so much as mention Dr. Cohen, or, for that matter, Dr. Sedgi, despite having been given the opportunity to do so. In light of the fact that substantial evidence supported the ALJ's determination that Osborn was not disabled within the meaning of the SSA, we cannot say that the ALJ failed in its duty to fully and fairly develop the medical record.

In sum, we conclude that substantial evidence supports the ALJ's

---

[2] Because Osborn was represented by counsel, the ALJ was not under a heightened duty probe, inquire, and explore for all the relevant facts. See Brown v. Shalala, 44 F.3d 931, 934-35 (11th Cir. 1995).

33

determination that Osborn was not disabled within the meaning of the SSA and we find no reversible error in any of Osborn's arguments.  We, therefore, affirm.

**AFFIRMED.**